Filed 10/8/20  In re J.T. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.T., A Person Coming Under the Juvenile Court Law. | B304175 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 18CCJP06239A |
| Plaintiff and Respondent, | |
| v. | |
| T.T. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County.  Stephen C. Marpet, Judge Pro Tempore of the Juvenile Court.  Affirmed.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant T.T.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant M.A.

Mary C. Wickham, County Counsel, Kim Nemoy, Acting Assistant County Counsel, Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

---

**INTRODUCTION**

Mother and father separately appeal from the juvenile court's order terminating parental rights to their daughter J.T. under section 366.26 of the Welfare and Institutions Code.[1] Mother contends the juvenile court erred when it denied her a contested hearing on the application of the beneficial parent-child relationship exception to termination of parental rights. Father contends that, if mother's rights are reinstated, his should be, too. Finding no prejudicial error, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**1.    *Events leading to dependency***

The family came to the attention of the Los Angeles Department of Children and Family Services (DCFS) in September 2018 when J.T. was born with a meconium drug screen positive for opiates (mainly morphine) and amphetamines (mainly methamphetamine). The baby was admitted to the Neonatal Intensive Care Unit for drug withdrawal symptoms.

Mother's urine toxicology screen was positive for methamphetamine and benzodiazepines. She admitted that she took prescribed anti-anxiety medication days before giving birth. Mother was diagnosed with generalized anxiety disorder and panic disorders when she was 18. She said she had been addicted

---

[1]    All further statutory references are to the Welfare and Institutions Code.

2

to prescription pills about eight or nine years ago, but never had an addiction to heroin or methamphetamine. Mother denied having used either drug "in several years." She claimed her positive drug test must have been from exposure to secondhand methamphetamine smoke during a recent visit to a friend's home. She said she will do whatever is necessary to ensure her baby's safety.

Father described his relationship with mother as " 'on and off.' " He said he was aware mother had substance abuse issues in the past, but based on what she told him, he assumed mother was sober during the pregnancy. Father denied using any substances himself.

The family decided mother would move out of maternal grandparents' home, where she had been living, and the maternal grandparents would help father to care for J.T. at their home when the baby was discharged from the hospital.

On September 27, 2018, DCFS filed a section 300 petition on behalf of J.T. alleging she was born with a positive toxicology screen due to mother's drug use and that mother's substance abuse and mental and emotional problems endangered the child. The petition also alleged father failed to protect J.T. from mother's substance abuse. The next day, the juvenile court detained the child from parents and ordered monitored visitation. J.T. was discharged from the hospital the next month, on October 29, 2018, and placed with maternal grandparents.

Mother visited J.T. almost every day during December 2018 and January 2019 at maternal grandparents' home. Maternal grandmother reported the visits were " 'going well.' "

At the combined adjudication and disposition hearing on February 13, 2019, the juvenile court sustained the petition as to

mother's substance abuse and mental and emotional problems. The court struck father from the petition, finding he was a non-offending parent. The juvenile court declared J.T. a dependent of the court, ordered she was suitably placed, and ordered parents have monitored visits and receive family reunification services.

## 2. *Reunification period*

In March 2019, J.T.'s pediatrician reported having observed " 'needle track marks [and] bruising going up [mother's] arm' " when mother alone brought J.T. to her six-month visit. That same day, a DCFS social worker visited maternal grandparents' home. Mother had a bedroom in the home. It was cluttered with prescription pill bottles, small alcohol bottles, urine in a drug-testing container, and other detritus.

Maternal grandparents and mother denied that mother was living in the home. Mother spent the entire day there, as she had nowhere to live, but said she did not stay the night. Concerned that maternal grandparents were allowing mother to reside in their home and not setting "appropriate boundaries" between J.T. and mother, the next day DCFS placed J.T. with mother's brother and his wife.

Besides the contact with the social worker during the visit to maternal grandparents' home in March, mother had not made herself available to DCFS between February and early April 2019 and had not made any progress in her court ordered services. Mother finally contacted DCFS in April 2019 and enrolled in an inpatient substance abuse program. Mother began visiting with J.T. at the inpatient facility once or twice weekly. Maternal uncle and aunt supervised the visits. As to one of the visits in April, they said it "went well" and that mother fed and changed J.T.

4

At the end of May 2019, the DCFS social worker met with mother and staff from the substance abuse program to discuss mother's visits with J.T.  The program was concerned about relative caregivers jointly supervising mother's visits and bringing their infant son to the visits.  It asked that only one monitor be present.  Because the caregivers were not comfortable monitoring mother's visits with J.T. individually, DCFS began monitoring the visits.  Maternal uncle and aunt reported the visits they monitored during this time "went well."  The DCFS social worker who began monitoring the visits said mother provided "appropriate care" to J.T.  In a later report, DCFS added more details about one of those visits.  It reported that during a May 2019 visit mother was "very affectionate" with J.T., she spread out a clean blanket for J.T., changed J.T.'s diaper, fed J.T. in the chair she provided, and allowed J.T. to crawl.  The social worker said J.T. focused on mother when the social worker held the child while mother cleaned up, indicating J.T. " 'was attaching' " to mother.  Mother also said her visits with J.T. had been "going well," and that she wanted to visit J.T. more often.

In June 2019, mother discharged herself from the program before completing it.  Mother's program could not provide her with the additional mental health services she needed and was in the process of transferring her to an inpatient dual diagnosis substance abuse program when she discharged herself.  Mother had been "doing pretty good" in the program—she tested negative for drugs, attended 12-step meetings, and completed a parenting class.  However, mother struggled with anxiety and "manic-type symptoms."

After mother left her inpatient program, maternal uncle and aunt resumed monitoring her visits with J.T.  Mother also

had regular video calls with J.T. when J.T. was with her relative caregivers on a five-week family vacation.

Mother moved into a sober living home on June 27, 2019. She continued random drug testing there and obtained a sponsor to work with her on progressing through the 12-step program. The home's manager said mother was attending 12-step meetings four to six times per week.

In its status review report filed August 2, 2019, DCFS described mother as in partial compliance with her court ordered services. Mother needed to enroll in a new substance abuse program, to begin working on her 12-step program with her new sponsor, and to address her mental health issues by enrolling in counseling and completing a psychiatric evaluation.

DCFS was unable to reach father until June 2019. Father had not visited J.T.

DCFS filed an interim review report on October 3, 2019. It noted mother continued to test negative for drugs and alcohol and consistently participated in her outpatient program and 12-step meetings. She also had completed a psychiatric evaluation in late August 2019. The psychiatrist stated mother was in the early phase of recovery from severe heroin dependency and was at high risk of relapse given her long history of abuse and recent recovery. Nevertheless, the psychiatrist was confident if mother stayed active in her recovery and abstained from all substance abuse that she would be able to care for J.T. He recommended that she remain in a monitoring program for two years. Mother began attending weekly individual counseling sessions in September 2019.

During this time, mother had two-hour visits with J.T. twice a week. In September 2019, maternal uncle and aunt

complained to the DCFS social worker that mother was late for her visits and often appeared to be distracted by her phone while visiting J.T., including taking pictures of J.T. Maternal aunt said mother had gotten better about being on the phone, however, and offered to take pictures of J.T. for her. The relative caregivers reported that mother sometimes made inappropriate statements to J.T. about the case, although they knew J.T. was not old enough to understand.

Maternal uncle and aunt also expressed concern over mother's anger. They described mother as unable to rationally and calmly discuss issues they raised with her. They said she engaged in manic-like behavior, bombarded maternal aunt with text messages, and, after becoming angry about her visitation with J.T. for the child's first birthday, told maternal grandmother she wanted to punch maternal uncle.

Mother denied these accusations, but admitted she sometimes was late to visits because she relied on maternal grandmother to drive her there. She also said she was just taking pictures with her phone. On October 2, 2019, after discussing the issue with all parties, DCFS liberalized mother's visits with J.T. to unmonitored, but still at the relative caregivers' home.

The next day, however, mother's sober living facility informed DCFS that mother had tested positive for "Kratom" and had been discharged. Kratom, an herbal product that "creates a general feeling of well-being for the user" and can cause mood swings, is not illegal, but mother was aware the

7

facility prohibited its use.[2]  The facility's manager was concerned about mother having unmonitored contact with J.T. due to her display of manic-like symptoms, which could have been exacerbated by her use of Kratom.

On October 3, 2019, before mother had any unmonitored visits, the juvenile court ordered mother's visits revert to monitored.  It convened the continued, contested six-month review hearing on October 16, 2019.  DCFS presented its reports from August 14, October 3, and October 16, 2019, as well as its delivered service log for the period from February to October 2019.  The log, filed the day of the hearing, included notes on visitation.  Mother testified at the hearing and presented evidence of her participation in court ordered services and recent negative drug test results.  After hearing mother's testimony and reviewing the evidence, the juvenile court terminated parents' family reunification services and set a section 366.26 permanent planning hearing.

**3.**    *Permanency planning period and section 366.26 hearing*

Maternal uncle and aunt were "eager" to adopt J.T.  DCFS noted J.T. had "thrived" in their care since being placed with them in late March 2019.  DCFS reported that J.T. "is currently very attached to her caregiver[s]" and "has developed a close,

---

[2]    DCFS's research on Kratom revealed it provides stimulation at low doses and opioid-like depressant and euphoric effects at higher doses.  It "is well known to be addictive.  Withdrawal effects are similar to narcotic withdrawal and drug-seeking behaviors have been observed."  Its "primary psychoactive component . . . is many times more potent than Morphine."

positive relationship with her caregivers, who maintain a safe and stable environment for the child." J.T.'s caregivers were providing appropriate care and meeting her needs. J.T. had become prone to screaming tantrums, but she would stop when maternal aunt and uncle redirected or distracted her.

During this period, mother continued to have monitored visits with J.T. twice a week at maternal uncle and aunt's home. On October 31, 2019, the relative caregivers told DCFS that mother's visits had been " 'going pretty well.' " Mother also had been finding her own transportation to visits so that she could arrive on time, and in turn had been having more positive visits. As of late December 2019, mother's visits continued to be "going well." Nevertheless, DCFS concluded mother's visits "are poor in quality as she does not assume the parental figure."

On February 11, 2020, the juvenile court convened the section 366.26 hearing. Father attended the hearing, but mother did not. She had transportation issues. On mother's behalf, counsel asked the court to set the matter for contest. In response to the juvenile court's request for an offer of proof, mother's attorney stated, "Mother has been visiting consistently with the minor since the last hearing. The report does reflect that these visits are going well and there's attachments between the mother and the child. I would request to set a contest under ([c])(1)(B)([i])." The court responded, "Well, based upon the reports before the court, mother's visits have been sketchy and not consistent and only monitored." It then denied the request for a hearing. The juvenile court found J.T. adoptable by clear and convincing evidence and terminated parental rights, having found no exception to adoption applied.

**DISCUSSION**

Mother does not contest the juvenile court's finding itself that an exception to adoption did not apply. Rather, she contends the juvenile court committed reversible error when it denied her request for a contested hearing on her bond with J.T., i.e., the application of the beneficial parent-child relationship exception to adoption under section 366.26, subdivision (c)(1)(B)(i). Father does not assert an independent basis for reversing the order terminating his parental rights. He argues the order should be reversed if mother's rights are reinstated, as J.T. cannot be adopted unless both parents' rights are terminated.[3]

**1.** ***The right to present evidence at a section 366.26 hearing***

" 'The selection and implementation hearing under section 366.26 takes place after the juvenile court finds that the parents are unfit and the child cannot be returned to them.' " (*In re Grace P.* (2017) 8 Cal.App.5th 605, 611 (*Grace P.*).) If, as here, the parents have failed to reunify with their child and the juvenile court has found the child likely to be adopted, "the burden shifts to the parents to show exceptional circumstances exist such that termination [of their parental rights] would be detrimental to the child." (*Ibid.*) The beneficial parent-child relationship exception is one such circumstance. For the exception to apply, parents must show they "have maintained regular visitation and contact with the child and the child would

---

[3] We note father does not have an independent basis to appeal the termination of his parental rights as he did not visit J.T.

10

benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"A parent has a right to due process at a section 366.26 hearing resulting in the termination of parental rights, which includes a meaningful opportunity to be heard, present evidence, and confront witnesses." (*Grace P., supra*, 8 Cal.App.5th at p. 612.) Parents may thus request a contested hearing to present evidence supporting their contention that an exception to the termination of parental rights applies. (*Id.* at p. 611.) Nevertheless, " 'due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest.' [Citation.] 'The trial court can therefore exercise its power to request an offer of proof to clearly identify the contested issue(s) so it can determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence and confrontation and cross-examination of witnesses.' [Citation.] The parent's offer of proof 'must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued.' " (*Id.* at p. 612; see also *In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122 (*Tamika T.*) [due process does not require a contested hearing if the parent does not proffer "relevant evidence of significant probative value" to the issue parent seeks to contest].)

We review the juvenile court's denial of a contested hearing for abuse of discretion. (*Grace P., supra*, 8 Cal.App.5th at p. 611.) We will reverse an order where the court has abused its discretion only if the abuse of discretion was prejudicial and resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

11

## 2. *Mother's offer of proof was insufficient*

A parent seeking to prevent termination of his or her parental rights under the beneficial parent-child relationship exception must satisfy a two-prong test. (*Grace P.*, *supra*, 8 Cal.App.5th at p. 612.) The first prong requires the parent to demonstrate that he or she has maintained regular contact with the child—a quantitative and relatively straightforward element. (*Ibid.*) The second prong requires the parent to demonstrate there is a sufficiently strong bond between the parent and child such that the child would suffer detriment from the termination of the parent's rights. (*Ibid.*) In other words, the parent-child relationship must " ' "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." ' " (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.) Thus, "[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466 (*Angel B.*).)

The second prong "involves a qualitative, more nuanced analysis, and cannot be assessed by merely looking at whether an event, i.e. visitation, occurred." (*Grace P., supra*, 8 Cal.App.5th at pp. 613.) Rather, it "requires the court's careful assessment of the child's relationship with the parent." (*Id.* at p. 614.) In *Grace P.*, relied on by mother, this division concluded a juvenile court abuses its discretion if it denies a contested hearing on the beneficial parent-child relationship exception when a parent— who has consistently visited his or her children—offers testimony about "the quality of their parent-child relationship and possible

resulting detriment that would be caused by its termination." (*Id.* at pp. 608-609.) As we will discuss, mother's offer of proof is distinguishable from that offered in *Grace P.*

   a.   *Mother's offer of proof was not sufficient*

Mother contends the juvenile court abused its discretion when it based its denial of mother's request for a contested hearing on its unsupported description of mother's visits with J.T. as "sketchy and not consistent."

Mother argues the evidence warranted a hearing because the DCFS reports showed mother consistently visited J.T. and that those visits were positive, but DCFS failed to include the monitors' positive accounts of her visits in its contemporaneous reports, delaying their presentation to the juvenile court until much later in the proceedings. Specifically, mother asserts DCFS did not include in its August 2019 report the social worker's description of mother's May 31, 2019 visit, where J.T. appeared to be tracking mother, showing she was attaching to her, and certain positive visits reported by maternal grandparents and maternal aunt and uncle. She argues a hearing was necessary to allow her to question DCFS about its delay until 2020, after reunification services had been terminated, in presenting those positive accounts of her visits, as well as its contradictory description of mother's visits as " 'poor in quality' " when—except for a period in September 2019—the monitors described her visits with J.T. in positive terms.

That mother may have had regular, positive visits with J.T. did not require the juvenile court to grant her an evidentiary hearing on the beneficial parent-child relationship exception, however. In *Grace P.*, we advised juvenile courts to "take caution before denying a contested hearing on [the existence of a

beneficial parent-child relationship] when a parent has clearly maintained regular contact with the child." (*Grace P., supra*, 8 Cal.App.5th at p. 615.) But, contrary to mother's implication, *Grace P.* does not stand for the proposition that due process requires an evidentiary hearing whenever a parent has maintained consistent contact with the child. To warrant a hearing, the parent's offer of proof also must address "the quality of their parent-child relationship and possible resulting detriment that would be caused by its termination." (*Id.* at p. 609.) Mother's offer did not.

In *Grace P.*, a father, who sought to invoke the beneficial parent-child relationship exception, proposed to testify about the quality of his weekly, monitored visits with his children, how he parented them during their visits, and how they considered him a parental figure. (*Grace P., supra*, 8 Cal.App.5th at p. 614.) He asserted he could testify that: he talked to his young children about school, brought them food, played with them, and addressed their behavioral issues; he told the children he loved them, and they returned the sentiment; and the children called him alone "papa" and " 'perceive[d] him in a parental role.' " (*Id.* at p. 610.) Because the father's proposed evidence was probative of the nature and quality of his relationship with his children and the detriment they would suffer if the relationship were severed, the juvenile court abused its discretion when it denied father a hearing. (*Id.* at pp. 614-615.)

In contrast, mother's counsel stated mother had been visiting consistently with J.T. since the last hearing and merely referred to the DCFS reports as reflecting that the "visits are going well and there's attachment[ ] between the mother and the child." Thus, mother did not propose that she could testify about

her parenting of J.T. or the quality of their relationship. Moreover, unlike the proposed testimony in *Grace P.*, the descriptions of mother's visits in the DCFS reports already were before the juvenile court. Nothing in counsel's offer of proof suggested mother could "expound on the details" reported by DCFS. (*Grace P., supra*, 8 Cal.App.5th at p. 615 [noting inability to conclude testimony would be duplicative of DCFS reports where offer of proof indicated father and child would "expound on the details of the relationship that has been positively . . . documented by DCFS"].)

In short, mother's offer of proof provided no indication that mother could testify to facts or produce other evidence demonstrating J.T.'s bond with her was sufficiently strong so as to outweigh the benefits the permanence and stability of adoption would provide, or that she would be harmed by its severance. (See *In re Anthony B.* (2015) 239 Cal.App.4th 389, 396 [issue is not whether a bond exists between parent and child but "whether that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption"].) As mother did not identify evidence that would demonstrate she and J.T. shared a beneficial parent-child relationship, the juvenile court was not required to grant mother a hearing on the issue even if the evidence demonstrated consistent visitation. (*Tamika T., supra*, 97 Cal.App.4th at p. 1122; *Grace P., supra*, 8 Cal.App.5th at p. 612.)

      b.    *The evidence before the juvenile court did not warrant a hearing*

Nor did the evidence already before the juvenile court show mother capable of establishing the second prong of the

beneficial parent-child relationship exception.  To satisfy her burden of proof, mother had to show "more than frequent and loving contact, an emotional bond with [J.T.], or pleasant visits." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229.)  Rather, mother had to offer evidence that showed she "occupies a parental role in [J.T.]'s life" (*ibid.*), creating a "*substantial, positive emotional attachment*" between them such that J.T. would be "*greatly* harmed" if their parent-child relationship were severed.  (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)  In assessing the beneficial nature of the relationship, the juvenile court must consider "numerous variables, including but not limited to: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the ' "positive" ' or ' "negative" ' effect of interaction between parent and child, and (4) the child's unique needs." (*Grace P., supra*, 8 Cal.App.5th at p. 613.)

The record shows mother fed and changed J.T., set out a clean blanket for her, provided J.T. with a feeding chair, and showed her affection.  The monitors reported that most of mother's visits with J.T. "went well," and, during one visit in May 2019, the social worker reported J.T. watched mother, indicating she was "attaching" to her.  Mother argues this evidence proves that, contrary to the DCFS report, she acted in a parental role. Mother may have engaged in some parenting activities, but this evidence does not demonstrate a significant parent-child bond existed between J.T. and mother at the time of the section 366.26 hearing or that J.T. perceived mother in a parental role.  For example, mother neither presented nor proposed to present evidence that J.T. sought mother for comfort or that J.T. was upset when her visits with mother ended.

At the time of the February 2020 hearing, J.T. was about 17 months old. She had been cared for by maternal uncle and aunt for the majority of her young life, since she was about six months old. Mother, on the other hand, never truly had custody of J.T.—the baby was hospitalized at birth for drug withdrawal symptoms and placed with maternal grandparents upon her release from the hospital in late October 2018.

The evidence before the juvenile court showed it was maternal uncle and aunt to whom J.T. had bonded and who met J.T.'s needs. They calmed J.T. during her inexplicable tantrums, packed her bag for a visit with mother, and noted her milestones. After five months in their care, J.T. was "very relaxed and happy in [their] presence." She smiled and looked up at them frequently. Before the section 366.26 hearing, the DCFS social worker observed J.T. and her caregivers to "have a strong, positive, and loving bond." The section 366.26 report described J.T. as "very attached" to her caregivers and having "developed a close, positive relationship" with them. She had "thrived in their care." Maternal uncle and aunt were "eager to adopt and to have the opportunity to raise [J.T.] as their own daughter." They wanted to provide J.T. "a permanent, nurturing home."

J.T. may have had positive visits with mother and demonstrated some attachment to her during the May 2019 visit, but the evidence did not show J.T. had developed a sufficiently strong emotional bond with mother such that its severance would be detrimental to the toddler. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 558-559 [parent must do more than show child "derives some measure of benefit from maintaining parental contact" to establish beneficial parent-child relationship exception].) Accordingly, the juvenile court did not abuse its

17

discretion when it denied mother an evidentiary hearing before terminating her parental rights, as mother did not present a prima facie case that the beneficial parent-child relationship exception applied. (*Grace P., supra*, 8 Cal.App.5th at pp. 613, 615.)

Due process also does not require a contested hearing to allow mother to cross-examine DCFS about its tardy presentation of some of the positive reports of her visits with J.T., or its assessment of the quality of those visits. All of the positive accounts mother cites in her brief had been filed with the court before it terminated her parental rights. Indeed, the log containing both the social worker's positive description of mother's May 31, 2019 visit, on which she relies so heavily, and the relative caregivers' positive statement as to the April 2019 visit, was filed with the juvenile court on October 16, 2019. The court thus was privy to those statements the day it terminated mother's reunification services and well before the February 2020 hearing.[4]

Moreover, although the August 14, 2019 DCFS report did not include the *details* of the above positively reported visits or maternal grandmother's positive description of mother's earlier visits, that report noted (1) mother visited J.T. almost daily when J.T. was in maternal grandparents' care, and maternal grandmother stated those visits "went well," (2) the social worker observed mother "provided appropriate care" for J.T. during visits, and (3) maternal uncle and aunt stated that the visits

---

[4]     DCFS included all of the positive visitation accounts mother describes in its section 366.26 report.

18

they had monitored "went well." Accordingly, even if the juvenile court did not read the log the day it was filed as mother surmises, the court was informed well before it terminated reunification services on October 16, 2019, that mother's visits with J.T. had been positive. Given mother proposes no new details to add about her visits, her cross-examination of DCFS about the timing of its release of those accounts or its interpretation of them would not result in new evidence probative of the quality of her relationship with J.T.

3. *Any error was not prejudicial*

Mother argues the juvenile court based its decision on an "invalid conclusion" requiring reversal because the DCFS reports show mother regularly visited J.T., and the monitors described the visits as primarily positive.

She cites to *In re Carmaleta B.* (1978) 21 Cal.3d 482, 495-496 (*Carmaleta B.*), for the proposition that we must remand a matter to the juvenile court to redetermine an issue when some of the grounds for its decision have been found to be supported and other grounds unsupported. We do not agree. "The reviewing court may affirm a juvenile court judgment if the evidence supports the decision on any one of several grounds." (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875 (*Jonathan B.*) [refusing to read *Carmaleta B.* to require reversal if one or more findings is unsupported by substantial evidence].)[5] " '[A] ruling

---

[5] Moreover, the facts in *Carmaleta B.* are distinguishable. Under the statute applicable there, the trial court was required to make a finding of detriment before it could free children from their parents' custody. One of the grounds for its finding of detriment was not supported as to any of the children, and the

or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.)  "We will not reverse for error unless it appears reasonably probable that, absent the error, the appellant would have obtained a more favorable result." (*Jonathan B.*, at p. 876.)

As we discussed, mother's offer of proof to the juvenile court did not demonstrate she could present probative evidence of a sufficiently strong parent-child bond to satisfy the exception. Therefore, even if the juvenile court had concluded mother consistently visited J.T., its decision to deny mother a hearing would not have been an abuse of discretion and is supported by the evidence.  Any error by the juvenile court in describing mother's visits as inconsistent thus did not prejudice mother.

Moreover, the juvenile court's reasoning was not invalid. Mother had only monitored visits with J.T., as recognized by the court.  DCFS liberalized them to unmonitored, but the liberalization had to be immediately rescinded due to mother's conduct.  After mother tested positive for the opiate-like herb Kratom—legal, but banned by her sober living facility—the

---

second ground was not supported as to one of the five children. Because the court may have decided the issue differently if it had not made the erroneous finding, the Court remanded the matter for redetermination.  (*Carmaleta B., supra*, 21 Cal.3d at pp. 495-496; *Jonathan B., supra*, 5 Cal.App.4th at p. 876 [describing facts of *Carmaleta B.*].)  *Carmaleta B.'s* analysis has been described as a " ' "harmless error" type analysis.' " (*Jonathan B.,* at p. 876.)

facility was concerned about mother having unmonitored contact with J.T. due to mother's subsequent manic-like behavior.

And, as DCFS notes, the juvenile court's description of mother's visits as "sketchy" could be attributed to evidence before the court, despite evidence of positive visits. Mother was described as " 'not all there' " when she visited J.T. at the hospital; she defied the court's initial orders by having unmonitored visits with J.T. at maternal grandparents' home, and her room at their house was in a state not appropriate for caring for an infant; maternal aunt and uncle reported mother was late to visits and on her phone and, at one point, had concerns about her anger; and, as we said, mother's Kratom use and subsequent mood swings prevented her from engaging in unmonitored visits with J.T.

In sum, because mother's offer of proof did not raise a viable issue as to the application of the beneficial parent-child relationship exception, the juvenile court did not abuse its discretion when it denied mother a contested hearing.

**DISPOSITION**

We affirm the juvenile court's February 11, 2020 order terminating parental rights.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.